Good morning, Your Honors. On behalf of the petitioner, Girish Srin, good morning, Counsel. In this case, Your Honors, you are dealing with an intemperate judge. You're dealing with a judge who didn't give my client a fair hearing, who misapplied the law, and at each time possible raised and felt that my client should not be believed. This hearing began originally in 1998. It was finished in 2003, and in 1998, the immigration judge with the trial attorney denied my client a fair hearing. My client has the burden of proof to prove a case, and the law in this circuit is quite clear that basically if you have credible testimony, you do not need corroborative documents. The hearing began in 1998, demanding documents and not allowing my client to present her case. The crux of her case is as a 1920-year-old young single Sikh female, she was arrested by the notorious Punjab police. Now, once does the immigration judge even read any of the reports mentioning the Punjab police? They have a notorious reputation. They have a reputation not only of raping, killing, detaining, but this Court has rendered decisions during that period of time stating that it's a pattern and practice of the Punjab police doing that. Has that been established in the record, or you're asking us to take judicial notice of that? Take judicial notice of that. Then to end with, the immigration law applied the wrong law dealing with rape. She made up facts. My client was arrested, illegally detained in a Punjab police, by the Punjab police, and raped, brutally, traumatically. The questioning that occurred basically was very unfair. The judge speculated it was due to a personal reason she was raped, which loses the context of when somebody is being controlled and being raped that it has nothing to do with sex. That was completely lost on the immigration judge. My client bowed her head in shame and humiliation, and the judge felt that was an evasive response, that a woman should not bow her head in shame and humiliation when she's being raped. That was the reason for her adverse credibility finding. As I understand, she covered her face. Yes. Okay. I wasn't there, Your Honor. I'm sorry. I mean, I don't want to say yes. I'm going by the same transcript. You did not try this case. I had nothing to do. I just received it for the Ninth Circuit. I didn't get the case at any other time. I'm reading the same transcript. All right. So that covering her face, it's illogical for the I.J. to conclude that she was hiding something, that she was not credible under the circumstances in this case. Is that what you're saying? Is that what I understand you're saying? I'm saying it's logical that she was feeling shame and humiliation describing the events. But I guess the question implied that was logical that she was being evasive, according to the judge's reasoning, in covering her face. I don't know how she reaches that, but that's the judge's. The whole hearing was done completely incorrectly and in a violation of my client's Fifth Amendment rights. She was asked at each time to corroborate. She wanted my client to bring in the smuggler who smuggled her into the country. The immigration judge said when my client got married in the United States, why isn't your husband here to describe? Describe what? My client's rape in an Indian jail? Why does she need her husband over here? I mean, I just didn't – the need of the witnesses that she required were completely unfair. Well, the I.J.'s real problems seem to revolve around the sense that she was really not – she was really maybe a Canadian citizen or something. She seemed concerned about her relationship to Canada. That seemed to be her biggest problem, really. Well – It was hard to figure out exactly why. But the only thing – isn't there something in the record that suggests that there was a way to kind of put this issue to rest by consenting to some investigation through the Canadian records and that your client didn't do that, wouldn't consent? Is that right? Let me respond by that, Joanna, and just – I'll just say it's like giving somebody an example by putting a stone around their neck and drowning them, and if they're drowned, finding them not guilty. Basically, my client specifically complied. She stated she was a refugee and she was smuggled into the United States by somebody driving a vehicle. She was only there for two or three days. She sent a letter through her attorney to the Canadian authorities requesting for information, any information they may have, that when she landed in Canada that she tore up her passport and applied for asylum. That is what she said. She complied and she sent that. And she did make inquiries through the Canadian? She contacted them. They rejected her contact and said, we want a specific document signed by you. The government, in the meantime, didn't need to do that. Two different procedures going on here. The government does a check-up on somebody called Manjeet Kaur, which isn't my client, never got any permission from my client. We don't even know who this Manjeet Kaur is, and they came back. Couldn't she have then responded in the manner in which it was a procedure that was required by the Canadian government and that she could have signed the document waiving any rights that she had in order to establish her position with respect to Canada? So that, and the fact that it's the government's burden, it's the government's burden if she was in Canada. But why can't an adverse inference be taken against her? Because she doesn't do that simple thing, which is to sign the document that the government required. Your Honor, it's because she was frustrated and humiliated during the hearings. She complied by birth certificates. She provided documentation. She sent a letter to the Canadian officials asking for that. Let me just interrupt you. She felt that the judge was just trying to make a spin. Anything she did, the judge was going to rule against her. She had seen that for the last five years prior to that. From the record, and this is where I want some clarification, wasn't the procedure that she could have followed a simple one? She knew what she had to do, to sign that one paper. And that paper would have given the government the opportunity to establish what she needed to establish. She wanted to have a surety that her family would not be harmed. Her brother had disappeared and she's alleging that her brother's been killed by the Indian police. She doesn't know what is going to happen to that piece of paper, who is going to investigate it, where is the investigation going to be, to occur. Her lawyer asked the United States government and attorney to verify her birth certificate, asked to She wasn't going to give a blanket agreement to somebody who she didn't know where her parents were complaining. Okay, that's helpful, but the content of that document, are you saying that if she had signed it, provided a waiver, that that would prejudice her in the future, could prejudice her family? Is that what you're telling me? She didn't do it because she was concerned about retribution against her family? We don't have the waiver. We don't have any language over there. We don't know what it states. We don't know where the waiver was going to be sent and who it was going to be sent to. And she didn't ask for it? Her attorney didn't ask for it, but she assumed? No, her attorney complied. Her attorney sent it to Canada. Her attorney, she was the first one who did that. She's the one who contacted the Canadians on her own initial to show the judge that what her story was, was correct. She tried to verify that, but she was unable to. The document, the document that she had signed. We don't have that document, and she was suspicious of that document in 2003. And you don't have the content of it that would establish that she had reason to be suspicious? I don't have the content, except for what she had seen happening in the hearing for the last five years to her. I'd like to keep the rest for rebuttal. Okay. Thank you. We have about a minute. We'll hear from the government at this time. Mr. Kilbourn. Your Honors, my name is James Kilbourn, representing the Respondent Attorney General. There is substantial evidence in this record to support the IJ's adverse credibility determination. Well, what is it, actually? I mean, let's leave aside this Canada business. Aside from that, what is it? What is the evidence that she was not telling the truth? There are a number of inconsistencies in this record. First off, speaking about the second arrest that happened where the alleged rape occurred, the alien gave two different statements about her state of consciousness. The page. That is really not so. I mean, I read that really carefully, and she said that she became unconscious after the rape. She didn't say whether she became unconscious because of the rape, something like that. Whether it was during the rape or after the rape was entirely unclear. Where did she ever say that she was unconscious during the rape? The first statement that she gave at the administrative hearing in 1998, which is Administrative Record 86, says she became unconscious when she was raped. When she was raped, i.e., she was raped and she became unconscious. Well, when is not after she was raped. Actually, I would read it that way. Most probably, I would take it to mean as a result of the rape, not during the rape. Well, the IJ was the one who heard the testimony and was entitled to make a determination in the first instance about what that testimony meant. She never said, I was unconscious when I was raped, during the rape. She said she became unconscious when she was raped, yes. Then she said, during the hearing of March 2003, she said she became unconscious after the rape. Was she confronted with that? Yes, she was. And what did she say? She said that she was, there was an extensive colloquy about this on the record in Administrative Record Cites 249 to 53. She testified to what happened during the rape. She said that she was not unconscious during the rape when she was confronted with the earlier statement where she said that she had been unconscious. If we accept your reading of when? Yes. Okay. And, well, not just my reading of when, but the IJ's reading of when. And, again, she was the fact finder and decision maker here, and her decisions are entitled to be defined. Was she asked whether she had testified earlier that she was unconscious during the rape? No, that specific point was not brought out. You know, interestingly enough, this is the exact same wording problem in the other case, when versus after. I don't know if you were here and listened to it. I don't know if that says something about the Punjabi language or what, but it's the exact same language issue, which is whether when and after can get confused. Just out of curiosity. Well, I will point out that neither Ms. Carr's counsel herself, I think this statement came during direct examination, and neither Ms. Carr's counsel herself nor anyone else wanted to or felt it was necessary to make that kind of distinction. You know, in an ordinary trial, if you want to point up to a trier of fact that there's been an inconsistency, the very first question you ask is, is it your testimony that? And then the witness says, yes, no, I don't know, I don't recall. Well, there was not any. And there's a follow-up. But in this instance, on this one year, we are sort of belaboring here, she was never asked, is it your testimony that you were unconscious during the rape? I – that kind of questioning did not happen at the 1998 hearing because there was not an apparent inconsistency at that point. Nor was it asked at the I.G. hearing. It was asked in the 2003 hearing where, when she said that she was alert when the rape occurred, she was specifically asked on cross-examination by government counsel, the inconsistency with the earlier testimony was pointed out, and she was specifically asked about that. So it happened in the very manner that you described. She was given an opportunity. The inconsistency was brought to her attention. Well, what wasn't brought to the attention was the exact language was. She says, is there any reason why in 1998 when you were in my court you claimed that you were unconscious when the rape happened? She says, I was not unconscious. So why did you say you were unconscious when you were in my court previously? I didn't say I was unconscious. So she did explain it. All right. There are other inconsistencies in the record. She testified – or she wrote in her application for asylum and in the affidavit that she submitted for that, that during the first arrest that she was beaten during the first arrest. During her testimony at the 2003 hearing, she said she was not beaten. And she was asked about that inconsistency. Where is that in the record? The testimony in the administrative record, the asylum application is at administrative record page 352. She says that she was beaten during her first arrest. 352? 352. Is there more than one volume? Did the IJA rely on this issue? The IJA relied – didn't point out this specifically, but relied generally on this point. On what point? I think generally regarding the circumstances surrounding her arrest and rape. I thought this was the second – I thought the rape was in the second arrest. Yes. It did occur during the second – Now you're talking about the first arrest. I am talking about the first arrest. Did she rely on anything concerning the first arrest? I think she – well, she didn't specifically mention the first arrest itself. Is the answer no, she didn't? She did not specifically point to the first arrest. Unspecifically? Where did she talk about it at all, unspecifically or specifically? She talks – I think she's talking about the circumstances surrounding the rape. So, all right. No, but this wasn't during – this was not that arrest. It was a different arrest, right? Yes, it was a different arrest. Okay. So where did the IJA rely on anything having to do with the first arrest? She does not specifically mention the first arrest. Okay. Now we have to answer the other question. Where is this contradiction? I'm sorry? You were going to show us what was in the – The testimony in the record, at the hearing record, is at AR-208 and AR-235. I don't have either of those because I only pulled out the ones the IJA relied on. Okay. We're on 208. Thank you. Well, starting at the bottom is C. They never did molest C. Talking about the police, they did not – they sometimes pinched them, sometimes pitched them quite a few times. They would say something. More particularly, I think I'd like to point you to 235. Okay. Second. Okay. I'm there. Starting on line six, when the police arrested me and took me to the police station, yes, they were pinching me. They were pointing to the hip. They were pinching me. And question, and that's all they did to you? Is that right? Answer, yes. And then this is the government's counsel questioning. Then she points out, well, according to your declaration and your attachment to Form I-589, that's the asylum application, it says that you were beaten at the police station. Can you explain that? And she says, the first time I don't remember whether they beat me, but they tried to molest me. And then the immigration judge begins to question about the inconsistency. There are also inconsistencies relating to the number of times that her brother had been arrested. Ms. Carr said that he was arrested twice, and she repeated throughout her testimony, she was consistent in her testimony in that regard, that he had only been arrested twice. The letter from the All Sikh Indian Federation says that he was arrested three different times. And I think the reason that this is relevant is it raises some question as to whether this is the same person and what the relationship was between the applicant here and the person spoken about in the All Sikh Indian Federation letter. And in fact, this is her, the alien's identity is a significant issue in this case because she herself was not politically active, and it was her brother. And she is essentially claiming, basing her claim on asylum because of what happened to her alleged brother. So having her identity established is significantly important. And that is why the inquiry to the Canadian authorities was very important. There really is no evidence in the record other than her own testimony as to what her identity was. One way to prove that would have been that she in fact was Manjinder Kaur, was to get information from the Canadian authorities. She testified in her own words. When she entered Canada, she asked for political asylum in Canada. She said she gave the Canadian authorities her real name of Manjinder Kaur. And the U.S. authorities during the course of this investigation inquired of Canadian authorities if they had any information about a Manjinder Kaur. They sent back information saying this is the only information we have related to an entirely different person. Everyone agrees it was not this alien. Then Ms. Kaur's counsel wrote to Canadian authorities asking for any information about a Manjinder Kaur. The Canadian authorities wrote back and said we need to, this is information protected by the Privacy Act. We need to have a waiver of privacy rights from your client. And Ms. Kaur refused to sign that waiver. Now, the information that was asked in the attorney's request is in the record, is information that the Canadian authorities had on Manjinder Kaur. That would not have had any, what that would have related to was her, the dates when she came into Canada, what she said her real name was, and what her basis for political asylum was. I'm confused about something. If they had already checked and discovered they had no record of a Manjinder Kaur other than a different one, then what good was this going to do? It would have, well. I thought maybe they were going to search in some other fashion, through fingerprints or something. But if the only thing that they're doing is looking, again, for Manjinder Kaur and they've already done that, what good is it going to do? Well, it just, it goes to the point that, you know, it is her response, her burden to establish who her identity is. I understand that, but I'm just trying to figure out how this inquiry didn't already dead end. I had a different impression of what this inquiry was going to be. But if it was simply going to replicate what already had been done and already dead ended, what was the point? Well, she claimed, she was claiming, well, part of the point, too, was whether she had firmly resettled in Canada, because when she. Because, in fact, the government made an inquiry, which is the same inquiry she had already made. She made an inquiry, which she signed herself and presumably didn't need a waiver, and she got the information. It sounds like this was just redundant. Well, the government did make an inquiry. I believe the government made the inquiry before she did. Right. The government didn't get the information because it wasn't her. Right. They weren't her, so they needed a waiver. But she made the same inquiry, and because it was her, she'd already gotten the information, which was they didn't have a record of Manjinder Kaur or someone. What was the point? What difference could it have made? Part of the reason, and the I.J. was asking her, did you – what happened to you in Canada? How long were you in Canada? Did you firmly resettle in Canada, which would have meant she would not have been entitled to come into the United States. I understand that. And one of the reasons for requesting information from Canada was not only to establish identity, but to establish what happened to her. I understand that. But if the information they're asking for – and I don't know where this is in the record. Maybe it's not. But if the information they were asking for was information about Manjinder Kaur, we already know the answer to that inquiry, which is it dead-ended. So the inquiry – the failure to pursue the inquiry itself couldn't have made any difference. Now, there may still be a hole in the record, but what can we ascribe to the fact that she didn't sign the waiver? She'd already made the information directly. Why did she have to sign the waiver for? I think it goes to her reluctance to provide information. And I do want to say that, you know, aside from her testimony, really, and a birth certificate that she submitted to the record which was not authenticated in accordance with proper regulations. Which I gather she was willing to have forensically investigated, but the government didn't do it. Is that right? No. The government said the problem was getting this document certified in an appropriate fashion, and that is by an appropriate individual. And that was her responsibility to do that. Okay. Our questions have taken you way over your time. Thank you for your argument. Thank you. We appreciate you coming in today. Rebuttal? Yes. Thank you very much, Your Honors. Basically, counsel has tried to obscure the issues. The issues are very clear over here. She did provide her identity. She did provide an Indian authentic birth certificate. It was authenticated. Her attorney did authenticate it. She did provide her father's affidavit. She did provide an all-Indian Sikh Student Federation, where he's just reading one line. Read the whole letter. The whole letter clearly indicates what happens to her. They're just picking little pieces over here. Clearly, the issues before you have nothing to do with her brother, but have to do with her imputed claim where the Indian government and the Indian police are accusing her of aiding and assisting Sikh militants. That's her claim as a young Sikh female. To place it on her brother is absolutely a red herring. But was the brother, the time she left, did she know where the brother was? Her brother had been detained and had never been released, and in her mind he was dead because the Punjab police was notorious for killing and burning bodies. And we don't know if he ever showed up again. He never showed up again. The father provided a certificate saying, please look after my daughter. He makes a plea to the immigration judge and his affidavit to the court to state what happened to her, what shame it caused his family. Okay. Thank you very much. Thank you for your argument, counsel. Thank both sides for their arguments. The case just argued will be submitted for decision.
judges: B. Fletcher, Berzon, Trager